*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0192**

Chase Rovere, et al.,
Respondents,

vs.

Clifford Ling, et al.,
Appellants.

**Filed January 8, 2024
Affirmed in part and reversed in part
Larson, Judge**

Jackson County District Court
File No. 32-CV-21-131

Michelle K. Olsen, Taliesen M. Burrows, Birkholz & Associates, L.L.C., Mankato, Minnesota (for respondents)

Elizabeth S. Hertz, Davenport, Evans, Hurwitz & Smith, L.L.P., Sioux Falls, South Dakota (for appellants)

Considered and decided by Cochran, Presiding Judge; Slieter, Judge; and Larson, Judge.

**LARSON**, Judge

Appellants/cross-respondents Clifford Ling and Mary Ann Ling[1] appeal from partial summary judgment and final judgment dismissing their counterclaims for breach of contract, intentional infliction of emotional distress (IIED), and fraud in the inducement. Respondents/cross-appellants Shelby Rovere and Chase Rovere[2] cross-appeal from partial summary judgment dismissing their declaratory judgment and waste claims. For the reasons given below, we affirm in part and reverse in part.

**FACTS[3]**

In 2017, Shelby approached her grandfather, Clifford, about buying her grandparents' farm. In June 2017, the parties entered into a contract for deed whereby the Lings sold their 127.15-acre property to Shelby for $406,875. The contract included an addendum adding several provisions, including that the property was purchased "AS IS AND WITH ALL FAULTS," and that the Lings would retain "the exclusive right to occupy the home, shop, machine shed, green garage, and white shed located on the Property as long as they cho[o]se and are physically able to do so."[4] This last provision

---

[1] While this appeal was pending, Mary Ann Ling passed away. Counsel for the Lings notified the court pursuant to Minn. R. Civ. App. P. 143.02 and explained that probate proceedings have not yet commenced.

[2] Because the parties are married couples who share surnames, for clarity, this opinion will refer to individuals by their first names.

[3] This opinion reviews both the district court's summary judgment and post-trial decisions. Because the parties do not appear to dispute the underlying facts with respect to the challenged summary judgment claims, we derive these facts primarily from the evidence presented at trial.

[4] We refer to these buildings collectively as "the Listed Buildings."

also provided that the Lings would remain responsible for the payment of utilities and all maintenance and repair expenses for the Listed Buildings.

Two years later, Shelby married Chase. Following the wedding, the Lings invited the Roveres to move into the basement of the home, where the Roveres lived until September 2021.

The Roveres believed that the Lings' right to occupy the Listed Buildings would terminate once the Roveres paid off the contract for deed. In preparation for obtaining a mortgage, the Roveres had the property appraised on October 27, 2020. The appraisal stated that the property had been "well maintained over the years," and valued the property at $754,671. The Roveres obtained the mortgage. Using the proceeds, on January 11, 2021, the Roveres paid off the contract for deed, and on February 1, 2021, Clifford signed a warranty deed conveying the property to Shelby. Shelby, in turn, deeded a joint interest in the property to Chase. Both deeds were recorded on February 3, 2021.

Soon after, on February 8, 2021, Shelby called a family meeting to discuss the Lings' ability to continue living on the property. Following this family meeting, the parties' relationship rapidly deteriorated.

At the time, Mary Ann received home healthcare. In April 2021, Chase reported to Mary Ann's home-healthcare provider that Clifford allegedly abused Mary Ann when he tied her to a chair, although Chase apparently made no attempt to assist Mary Ann. The home-healthcare provider investigated the accusation and determined no abuse occurred. In May 2021, Chase called a nurse at the home-healthcare provider to discuss Mary Ann's care and told the nurse that the Lings were not allowed to receive 24-hour care in the home.

The nurse believed Chase was trying to intimidate her to keep the home-healthcare provider out of the home.

On June 4, 2021, the Roveres' attorney sent a letter to the Lings, detailing the Lings' alleged failure to maintain the property and giving the Lings until July 31, 2021, to vacate the property under threat of legal action, including possible eviction proceedings. The Roveres put cameras up around the property, which made the Lings feel "uneasy" and like they had little privacy.

Further, after the Roveres installed a new furnace in the home, they moved the thermostat to their living space in the basement and put a lockbox on it, preventing the Lings from independently changing the temperature in the home. One of the home-healthcare nurses testified that, on a cold night in September 2021, she arrived at the house and found the Lings running space heaters to keep themselves warm. The nurse broke the lockbox off the wall to access the thermostat and adjusted the temperature, which she testified was set to cool.

On September 7, 2021, the Roveres filed a complaint against the Lings seeking a declaratory judgment that the Lings were no longer physically able to reside at the property, and damages for waste and breach of contract. On September 27, 2021, the Lings counterclaimed seeking a declaratory judgment that they possess a life estate in the Listed Buildings, contract rescission, and damages for breach of contract, IIED, and unjust enrichment.

In March 2022, both parties moved for summary judgment. On June 13, 2022, the district court issued its summary-judgment decision, dismissing the Roveres' claims for

declaratory judgment and waste, declaring that the Lings possess a life estate in the Listed Buildings, and dismissing the Lings' rescission counterclaim. The district court later granted the Lings' motion to amend to add a counterclaim for fraud in the inducement.

In August 2022, the district court held a two-day bench trial. The district court issued its decision on November 9, 2022, ruling in favor of the Roveres on their breach-of-contract claim. The district court ordered the Lings to make certain repairs or pay the Roveres to: (a) replace rotting boards on the deck and stain the wood or pay $3,000; (b) paint the home or pay the Roveres to do so; (c) replace rotted siding on the garage or pay $1,000; and (d) replace the chimney bricks or pay $4,000. The district court also dismissed the Lings' surviving counterclaims.[5] On December 19, 2022, the district court entered judgment.[6] Both parties appeal.

## DECISION

On appeal, the parties challenge both the district court's partial summary judgment decision and final judgment. The Roveres challenge the district court's decision on the declaratory judgment claim and counterclaim, and the waste claim at summary judgment. The Lings challenge the district court's decision to dismiss their rescission counterclaim at

---

[5] The Lings do not appeal the district court's decision on their unjust-enrichment counterclaim.

[6] On December 5, 2022, the Roveres filed a motion for amended judgment. The district court denied the motion on January 27, 2023, and issued an amended judgment. In their notice of appeal, the Lings indicated that they sought review of the January 27, 2023 amended judgment. On February 6, 2023, we issued an order construing the Lings' appeal as taken from the December 19, 2022 judgment. Accordingly, we do not consider the January 27, 2023 amended judgment.

summary judgment,[7] and their breach-of-contract, IIED, and fraud-in-the-inducement counterclaims after trial. The Lings also argue the district court erred when it determined the Roveres proved their breach-of-contract claim. We first address the challenges to the district court's summary-judgment decision and then address the challenges to the district court's posttrial judgment.

## I.

The Roveres challenge the district court's summary-judgment decision on the declaratory-judgment claim and counterclaim, and the waste claim. "We review the grant of summary judgment de novo to determine 'whether there are genuine issues of material fact and whether the district court erred in its application of the law.'" *Montemayor v. Sebright Products, Inc.*, 898 N.W.2d 623, 628 (Minn. 2017) (quoting *Stringer v. Minn. Vikings Football Club, LLC*, 705 N.W.2d 746, 754 (Minn. 2005)). In doing so, we view the evidence in the light most favorable to the party against whom summary judgment was granted. *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76-77 (Minn. 2002). We address each claim in turn below.

### A. Declaratory Judgment

The Roveres first argue the district court erred when it resolved the parties' competing declaratory-judgment claims in favor of the Lings, determining that the Lings possess a life estate in the Listed Buildings. The Roveres argue the contract for deed did not grant the Lings a life estate and, instead, it created a tenancy for years. On appeal, the

---

[7] We address this claim in Part II.A.2.

Roveres specifically argue the portion of the contract that provides for final payment by no later than December 1, 2041, placed a time limit on the Lings' interest, asserting that the Lings' interest existed only so long as the Roveres still had outstanding payments under the contract.

Under the Uniform Declaratory Judgments Act, courts have the power to "declare rights, status, and other legal relations," including those arising "under a deed, will, written contract, or other writings constituting a contract." Minn. Stat. §§ 555.01-.02 (2022). "Absent ambiguity, the interpretation of a contract is a question of law." *Roemhildt v. Kristall Dev., Inc.*, 798 N.W.2d 371, 373 (Minn. App. 2011), *rev. denied* (Minn. July 19, 2011). Questions of law are reviewed de novo. *Samuelson v. Farm Bureau Mut. Ins. Co.*, 446 N.W.2d 428, 430 (Minn. 1989).

When interpreting a contract, if there is a written instrument, we determine the parties' intent from the plain language. *Storms, Inc. v. Mathy Constr. Co.*, 883 N.W.2d 772, 776 (Minn. 2016). "An estate for life may be created by express limitation or by a grant in general terms." *Thompson v. Baxter*, 119 N.W. 797, 798 (Minn. 1909) (quotation omitted). "[When] the grant is made to a [person], or to a [person] and [their] assigns, without any limitation in point of time, it will be considered as an estate for life . . . ." *Id.* When a contract conditions a life estate on an event, the interest created is still a life estate "as much as if no such event had been contemplated." *Id.*

The Roveres' argument that the contract for deed created a tenancy for years rather than a life estate is unpersuasive. As an initial matter, the Roveres did not raise this issue below. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) ("Nor may a party obtain

7

review by raising the same general issue litigated below but under a different theory."). But even if the Roveres had argued this theory, the argument would still fail because it conflicts with the contract's plain language. The contract explicitly provided that the Lings have "the exclusive right to occupy the home, shop, machine shed, green garage, and white shed located on the Property as long as they cho[o]se and are physically able to do so." And contrary to the Roveres' argument, the section the Roveres reference simply established the schedule for payments made under the contract and set the interest rate on the payments. That section, as well as the rest of the contract, lacked any language suggesting that the Lings' life estate terminated upon full payment of the contract.

Because the contract granted the Lings the exclusive right to occupy the Listed Buildings "without any limitation in point of time," the district court appropriately construed the contract as creating a life estate in the Listed Buildings. *See Thompson*, 119 N.W. at 798.

### B.    Waste

The Roveres also argue the district court erred when it granted summary judgment on their waste claim. The Roveres make two arguments. First, they contend the district court misinterpreted the law when it required them to show a property value lower than the purchase price to prevail on their waste claim. Second, the Roveres argue the district court ignored a $99,442 decrease in property value in the 2020 appraisal. Neither contention persuades us.

"Waste is conduct by a person in possession of land which is actionable by another with an interest in that same land to protect the reasonable expectations of the

nonpossessing party." *Rudnitski v. Seely*, 452 N.W.2d 664, 666 (Minn. 1990). "Waste involves more than just ordinary depreciation, it involves negligence or intentional conduct which results in material damage to the property." *Id.* Damages for waste are typically measured by the diminution in the value of the property. *See Evans v. Kohn*, 128 N.W. 1006, 1007 (Minn. 1910).

The district court applied the correct legal standard when it dismissed the Roveres' waste claim. The Roveres correctly observe that the district court determined that Shelby purchased the property at a substantial discount, and that the property had increased in value between 2017 and 2020. But the district court made these observations only to indicate the difficulty in assessing any material damage—diminution in value—to the property, given the evidence presented. Thus, the district court *did not* require that the Roveres show the property decreased in overall value; instead, it found the Roveres failed to show the complained-of defects resulted in a diminution in property value.

We are likewise not persuaded by the Roveres' argument that the district court ignored the 2020 appraisal's $99,442 decrease in property value. First, the Roveres did not argue this point before the district court. *See Thiele*, 425 N.W.2d at 582. But even if they had, the appraisal specifically explained that the decrease in value resulted from physical depreciation. "Waste involves more than just ordinary depreciation." *Rudnitski*, 452 N.W.2d at 666. Waste involves "unreasonable abuse or neglect to the land," *id.* at 667, and the 2020 appraisal states "[t]he property has been well maintained over the years."

Because the district court applied the correct legal standard, we affirm the district court's decision to grant summary judgment on the Roveres' waste claim.

9

**II.**

The Lings challenge the district court's posttrial judgment dismissing their breach-of-contract, IIED, and fraud-in-the-inducement counterclaims. They also challenge the district court's judgment that they breached the contract for deed.

On appeal from judgment following a bench trial, "[w]e review questions of law de novo and questions of fact under the clearly erroneous standard." *In re Distrib. Of Attorney's Fees*, 870 N.W.2d 755, 759 (Minn. 2015) (reviewing a district court decision following a bench trial). "A finding of fact is clearly erroneous if we are left with the definite and firm conviction that a mistake has been made." *Id.* (quotation omitted). We address each claim in turn below.

**A.    Breach of Contract**

In its posttrial judgment, the district court both dismissed the Lings' breach-of-contract counterclaim and determined the Roveres proved the Lings breached the contract. The Lings challenge both decisions.

"The elements of a breach of contract claim are '(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant.'" *Lyon Fin. Servs., Inc. v. Ill. Paper and Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) (quoting *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011)). "A breach of contract is a failure, without legal excuse, to perform any promise that forms the whole or part of the contract." *Id.*

### 1. Roveres' Breach-of-Contract Claim

The Lings first argue the district court erred when it determined the Lings breached the contract for deed and warranty deed (collectively, "the contract") when they failed to maintain the Listed Buildings. The Lings argue that, while the district court correctly determined the Lings were not responsible for repairing any defects to the Listed Buildings that existed in 2017, it erroneously required them to pay for repairs the Roveres failed to prove arose after the parties entered into the contract.

When interpreting a contract, courts must construe a contract as a whole and attempt to harmonize all provisions. *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 525-26 (Minn. 1990). Under the contract, the Lings sold the property "AS IS AND WITH ALL FAULTS." But the Lings agreed to remain responsible "to pay all maintenance and repair expenses" for the Listed Buildings. To harmonize these provisions, the district court construed the contract to require the Lings to repair and maintain any damage to the Listed Buildings that occurred after 2017.[8] At trial, Clifford testified that he understood "repair" to mean fixing broken boards and similar conditions, while "maintenance" meant keeping a building painted "and whatever's required to keep it in good shape." The parties agree that the Roveres bore the burden to demonstrate a condition arose after 2017. *See D.H. Blattner & Sons, Inc. v. Firemen's Ins. Co. of Newark, N.J.*, 535 N.W.2d 671, 675 (Minn. App. 1995) (plaintiff bears the burden of proving breach).

---

[8] Neither party challenged the district court's contract interpretation.

After reviewing the record, we observe that the Roveres wholly failed to provide any evidence at trial regarding the condition of the Listed Buildings in 2017. Yet, because Clifford admitted the repair-and-maintenance clause included replacing broken boards and painting, we conclude the district court did not clearly err when it found the Lings breached the contract when they failed to replace the rotting boards on the deck, stain the deck, paint the home, and replace the rotted siding on the garage. This maintenance fits squarely within Clifford's admitted understanding of the Lings' obligations under the repair-and-maintenance clause.

The district court did clearly err, however, when it found the Lings breached the contract when they failed to maintain the chimney. The Roveres did not present any evidence that the chimney had degraded since 2017. And the only evidence in the record tends to support the opposite conclusion. Clifford testified "I don't think [the chimney bricks] look any different than the day we put 'em in," and the 2020 appraisal did not indicate any issues with the chimney. Even the contractor the Roveres hired to provide an estimate for repairing the Listed Buildings opined that the chimney's condition likely arose prior to 2017, testifying that everything "should have been fixed years ago."

For these reasons, we affirm the district court's decision on the Roveres' breach-of-contract claim, except that we reverse the district court's decision ordering the Lings to replace the chimney bricks or pay the Roveres $4,000.

### 2. The Lings' Breach-of-Contract Counterclaims

The Lings also argue the district court erred when it dismissed their breach-of-contract counterclaims against the Roveres. The Lings contend that the letter threatening

12

eviction proceedings was an unequivocal renunciation of the language in the contract granting them "the exclusive right to occupy the home," amounting to a breach of contract. While this is a close call, we do not agree.

Where a party renounces their liability under a contract, a breach of the contract has occurred. *Wormsbecker v. Donovan Constr. Co.*, 76 N.W.2d 643, 650 (Minn. 1956). However, "[t]he refusal to perform must in effect be an unqualified renunciation or repudiation of the contract." *Space Ctr., Inc. v. 451 Corp.*, 298 N.W.2d 443, 450 (Minn. 1980) (quoting *Matteson v. U.S. & Can. Land Co.*, 115 N.W. 195, 196-97 (Minn. 1908)). A renunciation or repudiation "not of that character" will not amount to anticipatory breach. *Id.*

While the Roveres did send a letter threatening an eviction action, to prevail, the Lings needed to show that the letter was an *unqualified* renunciation of the life estate. Here, the letter only threatened a *potential* eviction action if the Lings did not vacate the property. Given the deferential standard of review, we cannot conclude the district court's determination that the Roveres did not breach the contract via an unqualified renunciation was clearly erroneous.[9]

---

[9] The Lings also challenge the district court's decision to grant summary judgment on their breach-of-contract counterclaim seeking rescission. Like their damages counterclaim, the rescission counterclaim was premised on the theory that the Roveres breached the contract for deed when they threatened an eviction action. At summary judgment, for the counterclaim seeking rescission only, the district court determined that there were no genuine issues of material fact, and the Lings could not prove breach because the Roveres did not successfully remove the Lings from the Listed Buildings. Despite this decision, the district court permitted the Lings to present evidence of breach at trial in support of their damages counterclaim. As we have already concluded, the district court's finding that the Lings failed to prove breach was not clearly erroneous. Thus, even if the district

13

Further, even if the letter threatening an eviction action had been a breach of the contract, the error would be harmless because the district court correctly determined the Lings failed to prove damages flowing from the breach. As the district court noted, the letter caused the Lings considerable stress, but "[i]n general, extra-contractual damages, including those for emotional distress, are not recoverable for breach of contract." *Lickteig v. Alderson, Ondov, Leonard & Sween, P.A.*, 556 N.W.2d 557, 561 (Minn. 1996).

For these reasons, we affirm the district court's decision regarding the Lings' breach-of-contract counterclaims.

## B.     Intentional Infliction of Emotional Distress

The Lings next challenge the district court's decision to dismiss their IIED counterclaim. The Lings argue the district court erred when it concluded the Lings failed to prove severe emotional distress. According to the Lings, the district court applied an inappropriately high standard to their IIED claim when it required them to show a decline in health resulting from severe emotional distress and that the Roveres' conduct was the sole cause of that decline.[10] We are not persuaded.

There are four elements to an IIED claim: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional

---

court erred when it dismissed the recission claim at summary judgment, any error was harmless. *See* Minn. R. Civ. P. 61 (requiring harmless error to be ignored); *Goldman v. Greenwood*, 748 N.W.2d 279, 285 (Minn. 2008) (citing this aspect of Minn. R. Civ. P. 61).
[10] The Lings also argue the district court applied an incorrect legal standard to their IIED claim when it failed to consider their age and vulnerability in assessing whether the Roveres' conduct was extreme and outrageous. Because we conclude the district court properly found the Lings failed to prove severe emotional distress, we need not reach this issue.

distress; and (4) the distress must be severe." *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003) (quoting *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438-39 (Minn. 1983)).  Plaintiffs face a heavy burden to establish mental distress severe enough to prevail on an IIED claim: "[t]he law intervenes only [when] the distress inflicted is so severe that no reasonable [person] could be expected to endure it."  *Hubbard*, 330 N.W.2d at 439 (quoting Restatement (Second) of Torts § 46 comment j (1965)).

While we agree with the Lings that a plaintiff need not show a decline in health resulting from emotional distress, nor that the extreme and outrageous conduct caused the decline, we do not agree that the district court required such a showing here.  Instead, the district court dismissed the Lings' IIED claim because the Lings failed to present evidence of severe emotional distress.  As the district court noted, Mary Ann was unavailable to testify about any emotional distress she may have experienced, and thus provided no evidence of severe emotional distress.  And Clifford testified that he did not think the Roveres intentionally caused him emotional distress.

Therefore, we affirm the district court's decision to dismiss the Lings' IIED counterclaim.

### C.    Fraud in the Inducement

Finally, the Lings challenge the district court's decision to dismiss their fraud-in-the-inducement counterclaim.  The Lings argue the district court clearly erred when it found there was no evidence that, at the time she signed the contract for deed, Shelby intended to remove the Lings from the Listed Buildings.  The Lings also argue the district

15

court failed to consider statements the Roveres made to the Lings to induce them to accept an early payoff of the contract for deed. Neither argument is persuasive.

To prevail on a fraud-in-the-inducement claim, a party must prove: (1) the opposing party made a false representation of a past or existing material fact susceptible of knowledge; (2) with knowledge of the falsity of the representation, or the representation was made without knowing whether it was true or false; (3) with the intention to induce the first party to act in reliance thereon; (4) the representation caused the first party to act in reliance thereon; and (5) the first party suffered pecuniary damages as a result of the reliance. *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009).

Regarding the Lings' first argument, the district court did not clearly err when it found the Lings failed to present evidence that, at the time she signed the contract for deed, Shelby intended to remove the Lings from the Listed Buildings. The district court credited Shelby's testimony that she thought the Lings would likely occupy the Listed Buildings for only two to three more years, but that she did not believe the contract allowed her to decide how long the Lings would continue to do so. From this testimony, the district court inferred that Shelby did not "intend to evict" the Lings from the Listed Buildings when she entered into the contract for deed. We defer to the district court's credibility determinations, *see* Minn. R. Civ. P. 52.01 ("[D]ue regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.") and, therefore, we are not left with a definite and firm conviction that the district court made a mistake in finding Shelby did not intend to defraud the Lings at the time she signed the contract for deed.

16

The Lings' second argument, that the district court failed to consider the representations the Roveres made to the Lings to "induce them to accept the payoff of the Contract," ignores the fact that the Lings could not prevent the Roveres from paying off the contract. The contract for deed provided that the Roveres could fully prepay the price of the contract at "any time without penalty." The contract for deed created a contractual right for the Roveres to pay off the contract earlier than scheduled, so the district court's failure to consider the "further misrepresentations the Roveres made to the Lings to induce them to accept the payoff" was not error.

For these reasons, we affirm the district court's decision to dismiss the Lings' fraud-in-the-inducement claim.

## CONCLUSION

For the reasons articulated above, we affirm the district court's summary judgment order. We also affirm the district court's posttrial decisions dismissing the Lings' breach-of-contract, IIED, and fraud-in-the-inducement counterclaims. But because we conclude the district court clearly erred when it found the Lings failed to repair and maintain the chimney, thereby breaching the contract, we reverse paragraph 11 of the district court's conclusions of law and paragraph 1.d of the district court's order. The effect of our decision is that the Lings do not need to replace the chimney bricks or pay the Roveres $4,000 if the bricks are not replaced. We otherwise affirm the district court's decision on the Roveres' breach-of-contract claim.

**Affirmed in part and reversed in part.**

17